# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

|  |  |
|---|---|
| DEBORAH SANDERS,<br><br>Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL, Acting Commissioner of Social Security<br><br>Defendant. | No. 17 C 2672<br><br>Magistrate Judge Mary M. Rowland |

## MEMORANDUM OPINION AND ORDER

Plaintiff Deborah Sanders filed this action seeking reversal of the final decision of the Commissioner of Social Security denying her application for disability insurance benefits ("DIB") under Title II and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C § 636(c), and Plaintiff filed a request to remand for additional proceedings before the ALJ. This Court has jurisdiction pursuant to 42 U.S.C. § 1383(c) and 405(g). For the reasons stated below, the case is remanded for further proceedings consistent with this Opinion.

## I. PROCEDURAL HISTORY

Plaintiff testified at a hearing before an Administrative Law Judge (ALJ) on August 4, 2015, in Chicago, Illinois. (R. at 29). The ALJ also heard testimony from Grace Gianforte, a vocational expert (VE). (*Id.* at 77). The ALJ denied Plaintiff's re-

quest for both DIB and SSI on October 26, 2015. (R. at 10–21). Applying the five-step sequential evaluation process, the ALJ found that Plaintiff met the insured status requirements through March 31, 2007 and had not engaged in substantial gainful activity since her alleged onset date of September 1, 2003. (*Id*. at 12). At step two, for purposes of SSI, the ALJ found that Plaintiff had the following severe impairments: asthma, sleep apnea, and obesity. (*Id*. at 13). At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (*Id*. at 15). The ALJ then assessed Plaintiff's residual functional capacity (RFC)[1] and determined that Plaintiff had the RFC to perform light work except that she:

> can lift and carry 20 pounds occasionally and 10 pounds frequently; be on her feet standing/walking about 6 hours in an 8 hour workday and sit about 6 hours, with normal rest periods; is unable to work at heights, climb ladders, or frequently negotiate stairs; may only occasionally crouch, kneel, or crawl; should avoid concentrated exposure to fumes, dust, odors, gases or poorly ventilated areas; and should avoid operation of moving or dangerous machinery. (R. at 16).

The ALJ determined at step four that Plaintiff was able to perform past relevant work as a bobber because it did not require performance of work-related activities precluded by Plaintiff's RFC. (*Id*. at 19). Based on Plaintiff's RFC, age, education, work experience, and the VE's testimony that Plaintiff is capable of performing work as a stock checker, information clerk, and cafeteria attendant, the ALJ deter-

---

[1] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008).

mined at step five that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (*Id.* at 20). Accordingly, the ALJ concluded that Plaintiff had not been under a disability from September 1, 2003 through the date of the ALJ's decision. (*Id.* at 21). The Appeals Council denied Plaintiff's request for review on February 8, 2017. (R. at 1–4). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

## II. STANDARD OF REVIEW

A Court reviewing the Commissioner's final decision may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). It "must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). The ALJ's decision must be explained "with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "[T]he ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## III. DISCUSSION

Plaintiff argues that remand is warranted because the ALJ erred in his analysis of Plaintiff's RFC, physician assistant's opinion and Plaintiff's symptom statements. The Court agrees that the ALJ's analysis of Plaintiff's statements about her symptoms and of the treating physician assistant's opinion were flawed.[2]

**A. Symptom Evaluation**

At the hearing before the ALJ, Plaintiff testified that she ended her prior work in childcare because she was dozing off during the day, even while standing, and her legs would swell up while walking; she has daily headaches, lies down for about an hour when she has a headache, and believes her headaches are a side effect of her medication; her sister cooks dinner for Plaintiff and her kids because Plaintiff falls asleep or forgets while cooking; she only is able to grocery shop with family assistance; she stopped driving because she was falling asleep; the sleep apnea ma-

---

[2] Because the Court remands on these grounds, it does not address Plaintiff's other arguments at this time.

chine helps her sleep more at night and her daytime somnolence has improved, but she still dozes off and falls asleep multiple times during the day; her doctor increased her dosage for the sleep apnea machine; she tried exercising by walking but her legs swell up from walking; and she can walk about one block. (R. at 46, 48, 49, 54, 55, 56, 59, 60, 64, 69, 71, 74). The ALJ found Plaintiff's statements about her symptoms to be "not entirely credible", explaining:

> While the claimant has received medical attention for the conditions alleged, the objective evidence does not support the degree of debilitation alleged. Despite her reports otherwise at the hearing, the treatment records show generally good control of her various chronic conditions (asthma, diabetes, and hypertension) with fairly routine mediations during periods of compliance, with no evidence of need for frequent emergency medical treatment, recurrent hospitalizations, or end-organ damage. The claimant herself has acknowledged improvement in daytime somnolence with use of a CPAP machine, although the record also indicates non-compliance led her to being without that therapy for almost a year. While the claimant maintained at the hearing she has little functional ability, her statements in the record and to examining and treating medical professionals indicate otherwise and document ongoing ability to care for her own needs and those of others as well as to at least assist in performance of the routine chores associated with maintaining a household. (*Id*. at 18).

There are several problems with this explanation. First, the ALJ generally stated that Plaintiff "maintained at the hearing she has little functional ability" without identifying any specific statement or statements by Plaintiff. The Court cannot be sure whether the ALJ credited some of Plaintiff's statements about her symptoms and not others, or if he summarily found all of her statements "not entirely credible." *See Martinez v. Astrue*, 630 F.3d 693, 696 (7th Cir. 2011) ("There is no explanation of which of Martinez's statements are not entirely credible or how credible or noncredible any of them are.").

Second, the ALJ found that the "the objective evidence does not support the degree of debilitation alleged," but it is well-settled that an ALJ "may not discredit a claimant's testimony about her pain and limitations solely because there is no objective medical evidence supporting it." *Akin v. Berryhill*, 887 F.3d 314, 318 (7th Cir. 2018) (internal citations and quotations omitted). And here, the reasons the ALJ gave for finding a lack of support in the record were flawed or relied on select evidence without discussing other evidence favorable to Plaintiff. "Although a written evaluation of each piece of evidence or testimony is not required, neither may the ALJ select and discuss only that evidence that favors his ultimate conclusion." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) (internal citation omitted).

A review of the record reveals evidence favorable to Plaintiff and consistent with her hearing testimony. In May 2009, Plaintiff reported side effects of dizziness and headaches from her hypertension medicine. (R. at 340). In March 2010, she reported joint pain in her hips, "longstanding headaches" and "wakes up with headaches." (*Id.* at 351, 366). In June 2011, an advanced nurse practitioner noted that Plaintiff had "hypertensive urgency," adjusted her hypertension medication, and referred her to a doctor for further care. (*Id.* at 438). The same month, during an emergency visit for her hypertensive crisis, she complained of having a headache for two weeks, and at a follow-up visit, a doctor noted that she had pain her head. (*Id.* at 441, 447). In July 2011, Plaintiff was still complaining of headaches to an ophthalmologist. (*Id.* at 606). In November 2011, certified physician assistant Rachel Bykerk (hereafter, "Bykerk") noted that Plaintiff previously felt dizzy from her blood pressure medica-

tion. (*Id.* at 452). At a visit with Bykerk in March 2012, Plaintiff again reported that she gets headaches from medication. (*Id.* at 463). In January 2013, Bykerk noted that her asthma caused "nocturnal wakenings" and that she was seeing a pulmonologist after her asthma-related hospitalization. (*Id.* at 511–12). In February 2013, at a visit with Bykerk, Plaintiff reported that she was concerned about "excessive somnolence during the day," "wakes up frequently throughout the night," "some headaches," "could fall asleep at lights while driving." (*Id.* at 519). Bykerk recommended a "sleep study ASAP." (*Id.* at 523). On March 1, 2013, pulmonologist Dr. Juan Ayala, MD noted that Plaintiff "falls asleep during the daytime easily and…falls asleep at stop signs. She does not feel refreshed during the daytime. She wakes up at time gasping for air. She nods off easily during the daytime." (*Id.* at 873). Dr. Ayala told Plaintiff that she "CANNOT drive until she is being treated for [sleep apnea]." (*Id.*). Later in March 2013, pulmonologist Dr. Hamed Mataria, MD diagnosed moderate obstructive sleep apnea and recommended CPAP titration and sleep hygiene counseling. (*Id.* at 801). Dr. Mataria recommended a CPAP dosage of 8 cm water pressure and ramp of 15 minutes. (*Id.* at 803). In June 2013, Bykerk noted that Plaintiff was using her sleep apnea machine every night. (*Id.* at 745). Although she had increased energy, Plaintiff was "still only sleeping 4-5 hours a night," "wakes up with a headache every morning" and her asthma was not well controlled. (*Id.* at 742–45). Regarding her obesity, Bykerk noted that Plaintiff was "trying to walk, but experiences lower extremity swelling." (*Id.* at 746). At a follow up visit in June 2013, Plaintiff complained of dizziness in the morning. (*Id.* at 749).

In February 2014, Plaintiff reported to Dr. Ayala that she coughs a lot at night and occasionally wheezes, and Dr. Ayala changed her asthma medication. (*Id*. at 870). That same month, Dr. Preston Visser performed a behavioral health assessment, during which Plaintiff reported "poor self-care" as to her physical health and that she felt tired or had little energy more than half of the days in the previous two weeks. (*Id*. at 920–21). She was also "bothered a lot" by pain in her arms, legs, or joints. (*Id*. at 922). At a visit with Bykerk in February 2014, she reported only being able to walk one block, waking up in the night with a gagging sensation, needing to get up and stand, and experiencing night sweats when she used the CPAP machine. (*Id*. at 915). Bykerk noted that her sleep apnea, night sweats, and hypertension were all worse. (*Id*. at 918). In Spring and Summer 2014, it was noted that night sweats made it difficult for her to sleep at night and she complained of dizziness and headaches. (*Id*. at 924, 933, 936). At a behavioral health follow-up in June 2014, Plaintiff reported that regular exercise was difficult because of swelling and knee pain, and she experienced sleep issues nearly every day. (*Id*. at 943–44). In October 2014, Dr. Ayala requested a new sleep study for Plaintiff and worked to get her CPAP machine back. (*Id*. at 868). During that visit, Plaintiff reported that she could walk on a "flat surface for a few blocks." (*Id*.) In November 2014, Plaintiff returned to the sleep clinic and after testing, Dr. Mataria prescribed a higher pressure of 11 cm and ramp of 5 minutes for the CPAP machine. (*Id*. at 863). At a doctor's visit in November 2014 after falling on her knees, Plaintiff reported that walking aggravated her pain. (*Id*. at 854). The next month, Plaintiff told the doctor that she had been

"very tired week with body aches." (*Id*. at 838). In January 2015, Dr. Ayala again placed in an order for a CPAP machine, and in April 2015, Plaintiff was having trouble seeing Dr. Ayala because of insurance changes. (*Id*. at 866, 974). At a visit in May 2015, Plaintiff was back on her CPAP machine but was experiencing dizziness and lightheadedness and was referred for another sleep study. (*Id*. at 983–89).

Third, the ALJ also erred by relying on Plaintiff's "generally good control" of her asthma, diabetes, and hypertension to discredit her statements. (R. at 18). Earlier in his opinion, discussing Plaintiff's asthma, the ALJ cited treatment records "documenting usually acceptable to good control with daily use of routine medications" although he also acknowledged that she was hospitalized for asthmatic exacerbation and had emergency medical treatment for asthmatic bronchitis. (*Id*. at 17). Plaintiff's asthma was "well controlled" at times. But the record shows that other times it was not and sometimes was "very poorly controlled." (*Id*. at 508, 739, 743, 915, 935–38, 1014). The ALJ also did not address evidence showing that medical professionals frequently adjusted and/or increased Plaintiff's medications (*see e.g., id.* at 438–39, 455–56, 465, 511, 693, 863, 870, 933), which may be inconsistent with the ALJ's determination that she had "good control" over her conditions. Even if the ALJ was correct, he did not explain how the supposed "good control" of her conditions contradicted her statements about her symptoms.

Further, the ALJ did not say whether he believed this "good control" extended to Plaintiff's obesity or sleep apnea, both of which he found to be severe impairments. In fact, other than stating that Plaintiff was obese, the ALJ did not discuss her obe-

sity at all. *See Biggs v. Apfel*, Case No. 99 C 3446, 2000 U.S. Dist. LEXIS 13430, at *7 (N.D. Ill. Sep. 14, 2000) ("In assessing a Claimants' disability, all of the Claimant's impairments and their combined effect must be considered."). As Plaintiff further points out, the ALJ did not discuss the record's multiple references to her headaches other than noting a lack of "specific treatment" for her headaches. In *Cullinan v. Berryhill*, 878 F.3d 598, 605 (7th Cir. 2017), the Seventh Circuit was concerned by the lack of consideration of claimant's frequent debilitating headaches in her RFC: "No evidence in the record contradicted Cullinan's testimony about these limitations, so only the adverse credibility determination could explain the ALJ's omission…if [the headaches] were factored in, the case for disability would be stronger still. The ALJ has the burden to develop the record and assess whether symptoms are disabling."

Fourth, with regard her sleep apnea, the ALJ merely stated that Plaintiff acknowledged improvement with treatment and noted that she was without that treatment for about one year. It is not clear if the ALJ drew a negative inference from Plaintiff's "non-compliance" and resulting lack of treatment. That would have been error where, as here, the ALJ did not discuss the circumstances surrounding Plaintiff's non-compliance or why it took a year to get the CPAP machine back. The record reflects that it was taken away after she did not use it for 4 out of 30 days because she was having night sweats. (R. at 915); *see* SSR 16-3p, at *9 (An ALJ must consider that "[a]n individual may not agree to take prescription medications because the side effects are less tolerable than the symptoms."). Her doctors worked

to get it back for her and there appears to have been delay in her seeing Dr. Ayala because of insurance changes. (*Id*. at 57, 868–69, 915, 918). Even if the ALJ did not draw a negative inference from her non-compliance, he summarily discounted her symptom statements because she acknowledged that treatment improved her sleep apnea. But she also testified that despite improvement, she continued to fall asleep during the day, multiple times a day. The ALJ failed to explain how improvement undermined her statements that she continued to experience symptoms or how it related to her ability to work. It is well-settled that "[t]here can be a great distance between a patient who responds to treatment and one who is able to enter the workforce." *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011).

Fifth, the ALJ stated that Plaintiff's statements in the record and to examining and treating medical professionals contradicted her statements at the hearing, without identifying which statements were contradictory. Earlier in his opinion, the ALJ cited one record in October 2013 where Plaintiff reported being able to walk two miles three times a week. (R. at 17). But other records showed that she reported only being able to walk a few blocks or one block, that walking caused swelling in her legs and feet, and suffered from headaches, lightheadedness, and dizziness.

The examining and non-examining state agency doctors' reports also contain information consistent with Plaintiff's testimony. During her mental status evaluation in June 2013 (R. at 655–59), Plaintiff explained that she left her job as a child care worker because "I couldn't stay up", "I was getting headaches", "I was dozing off", "My legs were getting swollen", and "I couldn't walk the kids." (*Id*. at 656). She

reported "difficulty sleeping", not sleeping more than four hours at a time, and dozing during the day. (*Id.* at 657). In her internal medicine consultative examination, also in June 2013 (*id.* at 662–69), Plaintiff described "significant improvement" in daytime somnolence and morning headaches, though Dr. Ryan concluded that she had "*some* improvement" in sleep apnea symptoms. (*Id.* at 662) (emphasis added). In the January 2014 state agency reconsideration report, Plaintiff reported that she is "still using her sleep apnea machine", "still doses during the day and is up half the night," and "[i]f she walks more, her legs and feet swell up more." (*Id.* at 104).

Finally, the ALJ found that Plaintiff had "ongoing ability to care for her own needs and those of others as well as to at least assist in performance of the routine chores associated with maintaining a household." But the record reflects that she needed family members' assistance in cooking and grocery shopping, did not drive because of her sleep apnea, and admitted to poor self-care. Even so, "minimal daily activities…do not establish that a person is capable of engaging in substantial physical activity." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

### B. Physician Assistant's Opinion

On July 23, 2015, Bykerk completed a "General RFC Questionnaire" for Plaintiff. (R. at 1020–27). The ALJ gave "no weight" to this questionnaire. (*Id.* at 18). The ALJ did not adequately explain this decision and did not rely on any other medical opinion to find Plaintiff able to perform full-time light work requiring her to stand/walk about 6 hours in an 8 hour workday. Instead the ALJ stated that his RFC assessment was consistent with evidence from two state agency examining

doctors and agency ultimate findings of "not disabled," even though these reports did not provide medical opinions about Plaintiff's physical limitations related to her ability to work and did not consider the full scope of the medical record.[3]

Although an ALJ has more discretion in weighing the opinion of a physician assistant than that of a doctor, both SSA rulings and case law make clear that opinions from physician assistants are "important and should be evaluated on key issues such as impairment severity and functional effects." SSR 06-03p, 2006 SSR LEXIS 5 (noting that "other sources" such as physician assistants "have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians"); *see also Gerstner v. Berryhill*, 879 F.3d 257, 262 (7th Cir. 2018) ("ALJs must consider psychologists' and nurse practitioners' opinions on the severity of a patient's impairments.").

To evaluate opinions from "other medical sources," an ALJ should "'apply the same criteria listed in 20 C.F.R. § 404.1527 for evaluating medical opinions from acceptable medical sources … includ[ing] 'the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion.'" *Shegog v. Berryhill*, No. 16 C 7436, 2018 U.S. Dist. LEXIS 66736, at *8 (N.D. Ill. Apr. 20, 2018) (internal citations omitted); *Cummings v. Colvin*, No. 14 CV 10180,

---

[3] *See Akin v. Berryhill*, 887 F.3d 314, 318 (7th Cir. 2018) (the ALJ "could have sought an updated medical opinion" and "should have developed a more fulsome record about [claimant's] testimony of pain before discounting it.").

2016 U.S. Dist. LEXIS 113209, at *7 (N.D. Ill. Aug. 24, 2016) (opinions of "other medical sources" should be weighed by considering same set of regulatory factors).

The ALJ's explanation for giving Bykerk's opinions "no weight" did not provide the Court enough to follow the ALJ's reasoning, particularly where Bykerk's opinion that Plaintiff could stand/walk no more than two hours out of an eight-hour work day (R. at 1021), would have impacted the outcome of the case. *See* SSR 06-03p, 2006 SSR LEXIS 52006 SSR LEXIS 5; *see also* R. at 84–85 (VE testified that two hour limit for standing and walking would limit Plaintiff to sedentary work). The ALJ did not address the length, nature, or extent of their treatment relationship, frequency of examination, or types of tests that were performed while Plaintiff was under Bykerk's care. The record shows that they met numerous times over the course of their treatment relationship. Bykerk ordered lab tests and prescriptions for Plaintiff, adjusted her medications, made referrals to specialists, and corresponded with Plaintiff's treating specialist doctors.

The ALJ pointed out that the questionnaire required a doctor's co-signature and did not have one. This may be a valid concern but does not explain completely disregarding Bykerk's opinions. The ALJ also stated that Bykerk opined on areas "beyond her area of expertise" but did not address what her specialty was or was not. The only clue (from the ALJ's phrase "including mental") suggests that the ALJ did not believe Bykerk was qualified to opine on Plaintiff's mental limitations, but that does not explain why the ALJ gave no weight to Bykerk's opinions about Plaintiff's physical limitations. The ALJ also suggested that Bykerk's opinions were not con-

sistent with the record, but failed to provide any specifics about which "limitations/events" were not supported by the record. The Court is also confused by the ALJ's affording "no weight" to Bykerk's questionnaire but nevertheless crediting one statement that he believed supported his conclusion. Bykerk's full statement reads, "Chronic conditions [sleep apnea, diabetes, hypertension] will continue, can be well controlled if adherent to meds." (R. at 1020). This does not say that Plaintiff's *symptoms* were well controlled. And the ALJ did not explain how Plaintiff's positive response to medications equated to her being able to enter the workforce.

In sum, remand is warranted because the ALJ did not build a logical bridge between that evidence and his ultimate determination, preventing the Court from assessing the validity of the ALJ's findings and providing meaningful judicial review.

## IV. CONCLUSION

For the reasons stated above, Plaintiff's request to remand for additional proceedings [14] is **GRANTED**, and the Commissioner's motion for summary judgment [17] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R :

Dated: July 23, 2018

*Mary M Rowland*

MARY M. ROWLAND
United States Magistrate Judge